UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 06 CR 763 |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CHARLES WHITE | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby submits its response to defendant CHARLES WHITE's motion for compassionate release. R. 485. As discussed below, defendant has failed to establish that he meets the requirements for relief under § 3582(c)(1), and his motion should be denied.

**I.     BACKGROUND**

    **A.     Offense Conduct and Procedural History**

On March 23, 2010, defendant was charged by a superseding indictment with seven counts of wire fraud, in violation of 18 U.S.C. § 1343. R. 195. Evidence presented at the five week trial—including bank, real estate and bankruptcy court records and testimony of victims, straw purchasers and other insiders—showed that Charles White orchestrated a large-scale wire fraud scheme in the Chicago area during 2004 and 2005, in which, co-defendants Norton Helton (an attorney) and Felicia Ford (a title closer) participated in. Through the guise of a mortgage bailout program, defendants defrauded insolvent homeowners desperately seeking to save their homes from foreclosure, and defrauded mortgage lenders that, as a result of the

scheme, provided financing for straw purchasers in fraudulent real estate sales of these homes. As part of the fraudulent bailout scheme, White and Helton also directed certain homeowners to file for bankruptcy, and, thereafter, to protect the fraudulent bailout scheme and its profits to defendants, Helton engaged in efforts to conceal the fraudulent real estate transactions from the bankruptcy debtors' creditors.

More specifically, defendant designed and managed the alleged "mortgage bailout" program through his purported real estate management company, Eyes Have Not Seen ("EHNS"). EHNS purported to offer insolvent homeowners a program designed to prevent them from losing their homes in foreclosure. EHNS implemented this "program" through systemic mortgage fraud. In particular, the defendants fraudulently obtained mortgage financing by submitting and causing to be submitted to mortgage lenders, false and fraudulent mortgage loan applications. By way of example, Charles White prepared loan applications that fraudulently misrepresented that buyers intended to occupy the property to be purchased, when, in truth and in fact, he knew that to be false. White also prepared loan applications that fraudulently represented purchasers' employment history and assets. He caused fictitious and fraudulent verifications of deposit, rent and employment forms to be prepared and submitted to lenders. Finally, White purchased cashier's checks bearing purchasers' names to be fraudulently submitted as their own down payment contributions. White's in house title company settlement agent, defendant Felicia Ford, facilitated this fraud by accepted cashier's checks provided by White as purchasers' down

2

payments despite knowing the true origin of the checks. Ford further presented real estate closing documents to lenders, including White's cashier's checks, that fraudulently represented that the purchasers had provided those down payments. Defendant Norton Helton was retained by White to appear at EHNS's real estate closings, theoretically to represent program participants. In reality, Helton only acted to facilitate the fraudulent sales orchestrated by White. Helton not only participated in the operation of EHNS's mortgage bailout program, he created Diamond Management of Chicago, Inc. ("Diamond") to implement his own, comparable foreclosure avoidance program. Using their mortgage bailout programs as cover, White and Helton stripped available equity from clients' homes at the time of sale.

The defendant proceeded to trial on June 7, 2010. R. 268. After nearly five weeks, on July 9, 2020, the jury returned a verdict finding defendant guilty of all of the charges alleged against him. *Id.* On September 28, 2011, Judge Samuel Der-Yeghiayan sentenced defendant to a term of imprisonment of 266 months. R. 338. Defendant filed post-trial motions for a new trial, which the court denied. *See* R. 279, 315, 322.

Defendant appealed his sentence. The Seventh Circuit affirmed. *See United States v. White*, 737 F.3d 1121 (7th Cir. 2013).

On or about July 6, 2020, defendant filed a *pro se* motion to appoint attorney "to fully brief this Court" with respect to a motion for compassionate release. R. 485. On or about July 28, 2020, this Court denied defendant's motion without prejudice as to appointment of counsel and held that, under General Order 20−0016, the Federal

Defender Program may advise the Defendant if the Program deems it appropriate. DRkt. 488. This Court also converted the motion to a motion for compassionate release and ordered the government's response due by August 11, 2020. *Id.* On or about August 11, 2020, the government filed a motion to extend the government's deadline to respond to defendant's motion as, per the Bureau of Prisons, the defendant was expected to be transferred to home confinement. R. 489. This Court granted the government's motion and held that the government's response was due August 24, 2020. R. 490. On or about August 20, 2020, the government learned that BOP is no longer planning to transfer the defendant to home confinement.

### B.   The BOP's Response to COVID-19

As reported on the BOP's website, in January 2020, the BOP began a course of action to respond to the spread of COVID-19.[1] Phase One of this course of action included the creation of an agency task force working in conjunction with subject matter experts from the Center for Disease Control and Prevention ("CDC") and the World Health Organization to review guidance about best practices to mitigate transmission. *Id.* On March 13, 2020, as part of Phase Two of the course of action, the BOP began implementing various measures to mitigate the spread of the virus. These measures included suspending social visits, in-person legal visits, all inmate movement, and staff travel. The BOP also began implementing procedures to quarantine and screen inmates and staff for the virus, which included screening all newly arriving inmates for exposure risk factors and symptoms, quarantining

---

[1] Federal Bureau of Prisons COVID-19 Action Plan, March 13, 2020, https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited Aug. 23, 2020).

4

asymptomatic inmates with exposure risk factors, and isolating and testing symptomatic inmates with exposure risk factors. *Id.*

Subsequent phases of the BOP's response included the authorization of inmate movement in order to avoid overcrowding at BOP facilities. However, such movements were limited to inmates who had been in custody for more than fourteen days and who had been subjected to exit screening to ensure that the prisoner had no COVID-19 symptoms (fever, cough, shortness of breath) and a temperature less than 100.4 F.[2] Subsequent phases of the course of action included the quarantine and isolation of all new inmates with asymptomatic inmates being quarantined for fourteen days and symptomatic inmates being isolated until testing negative for COVID-19, modifying operations to maximize social distancing, the maximization of telework for staff members, and conducting inventory reviews of all cleaning and medical supplies to ensure ample supplies were on hand and ready to be distributed as necessary at BOP facilities.[3]

On April 1, 2020, as part of Phase 5 of its COVID-19 action plan, the BOP secured all inmates to their assigned cells or quarters to decrease the spread of the

---

[2] Updates to BOP COVID-19 Action Plan, March 19, 2020, https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited Aug. 23, 2020).
[3] Bureau of Prisons Update on COVID-19, March 24, 2020, https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf (last visited Aug. 23, 2020); COVID-19 Action Plan: Phase Five, March 31 2020, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited Aug. 23, 2020).

virus.[4] On April 13, 2020, as part of Phase 6 of its COVID-19 action plan, the BOP continued to secure all inmates to their assigned cells or quarters to decrease the spread of the virus.[5] Thereafter, on May 18, 2020, the BOP extended the implementation of Phase 7 of its COVID-19 plan until June 30, 2020.[6] Phase 7 extends all measures from Phase 6, including measures to contain movement and decrease the spread of the virus. Further details and updates of BOP's modified operations are available on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

Defendant is currently incarcerated at FCI-Milan, which is a low security federal correctional institution located in Milan, Michigan. White is projected to be released from the Bureau of Prisons on or about June 12, 2029. *See* Bureau of Prisons, Inmate Locator, https://www.bop.gov/inmateloc/.

As of August 23, 2020, the Bureau of Prisons reported that there was one active COVID-19 case among inmates and one active COVID-19 cases among staff at FCI-Milan. *See* Bureau of Prisons, COVID-19, available at https://www.bop.gov/coronavirus/ (last visited August 23, 2020).

---

[4] COVID-19 Action Plan: Phase Five, March 31, 2020, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited Aug. 23, 2020).
[5] COVID-19 Action Plan: Phase Six, April 13, 2020, https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf (last visited Aug. 23, 2020).
[6] Bureau of Prisons COVID-19 Action Plan: Phase Seven, May 20 2020, https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp (last visited Aug. 23, 2020).

## II. ARGUMENT

Defendant's motion should be denied. He has failed to exhaust his administrative remedies before seeking relief from this court. Even if he had complied with that statutory requirement, he would be ineligible for relief because he poses a danger to the community and has not established that the requested sentence reduction would be consistent with the relevant sentencing factors set forth in 18 U.S.C. § 3553(a).

### A. Legal Standard

As amended by Section 603(b) of the First Step Act of 2018, Pub. L. 115-391, Title 18, United States Code, Section 3582(c)(1)(A) provides:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Direct of the Bureau of Prisons that the defendant is not a danger to the safety

7

of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Under the statute, a sentence reduction must be consistent with applicable policy statements issued by the Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A). In addition to finding "extraordinary and compelling" reasons for the reduction, the court must also find that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)" per Guidelines § 1B1.13(2). Finally, the court must consider the relevant 18 U.S.C. § 3553 sentencing factors. *Id.*

Congress directed that the Sentencing Commission issue policy statements defining the "extraordinary and compelling reasons" that might warrant a sentence reduction under § 3582(c)(1)(A)(i). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."). Pursuant to this directive, the Sentencing Guidelines Manual sets forth the Commission's policy statement relating to § 3582(c). Guidelines § 1B1.13 provides that under § 3582(c)(1)(A), a court may reduce a term of imprisonment, after considering the Section 3553(a) factors, if three criteria are satisfied: (1) "extraordinary and compelling reasons warrant the reduction"; (2) "the defendant is not a danger to the

8

safety of any other person or to the community"; and (3) "the reduction is consistent with this policy statement." Accordingly, in order to obtain relief under § 3582(c)(1)(A)(i), defendant must show that (1) he has requested relief from the Bureau of Prisons and exhausted any administrative appeals in that process; (2) there exist extraordinary and compelling reasons that warrant a sentence reduction; (3) the requested reduction is consistent with the policy statements issued by the sentencing commission in Guideline § 1B1.13, including the requirement that "the defendant is not a danger to the safety of any other person or to the community"; and (4) the reduction is warranted in light of the factors listed in 18 U.S.C. § 3553.

### B.  Defendant Has Not Exhausted His Administrative Remedies.

#### 1.  The Administrative Process

The Bureau of Prisons has established an orderly process for review of requests for reductions of sentence and compassionate release:

> A request for a motion under 18 U.S.C. 4205(g) or 3582(c)(1)(A) shall be submitted to the Warden. Ordinarily, the request shall be in writing, and submitted by the inmate. An inmate may initiate a request for consideration under 18 U.S.C. 4205(g) or 3582(c)(1)(A) only when there are particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing. The inmate's request shall at a minimum contain the following information:
>
>   (1) The extraordinary or compelling circumstances that the inmate believes warrant consideration.
>
>   (2) Proposed release plans, including where the inmate will reside, how the inmate will support himself/herself, and, if the basis for the request involves the inmate's health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment.

9

28 C.F.R. § 571.61(a). The Bureau of Prisons "processes a request made by another person on behalf of an inmate [for example, defendant's counsel] in the same manner as an inmate's request." *Id*. § 571.61(b).

The Bureau of Prisons' regulations also establish procedures for the consideration and administrative review of compassionate release requests involving the Warden, General Counsel, and Director of the Bureau of Prisons. 28 C.F.R. § 571.62(a). If a request for compassionate release is denied at any level of the Bureau of Prisons' internal review process, the inmate is entitled to "written notice and a statement of reasons for the denial." 28 C.F.R. § 571.63(a). When an inmate's request is denied by the Warden, the "inmate may appeal the denial through the Administrative Remedy Procedure (28 CFR part 542, subpart B)." *Id*.

Consistent with the statutory exhaustion requirement, the Bureau of Prisons' program statement on compassionate release requests states that "an inmate may file a request for a reduction in sentence with the sentencing court after receiving a BP-11 response [from the Warden] under subparagraph (a), the denial from the General Counsel under subparagraph (d), or the lapse of 30 days from the receipt of such a request by the Warden of the inmate's facility, whichever is earlier." *See* Bureau of Prisons Program Statement No. 5050.50 (rev. Jan. 17, 2019), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf (last visited July 10, 2020). The Bureau of Prisons' regulations make clear that "[i]n the event the basis of the request is the medical condition of the inmate, staff shall expedite the request at all levels." 28 C.F.R. § 571.62(c).

The Bureau of Prisons' receipt and consideration of compassionate release requests occurs against the backdrop of an annual reporting requirement to Congress. 18 U.S.C. § 3582(d)(3). By requiring the Bureau of Prisons to submit annual reports about its handling of compassionate release requests, Congress demonstrated that it clearly understood the importance of requiring inmates to submit requests through established Bureau of Prisons channels and intended that procedure to be followed.

### 2. Defendant Has Not Complied with the Statutory Exhaustion Requirement.

Title 18, United States Code, Section 3582(c)(1)(A) provides that the court may reduce a defendant's term of imprisonment "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. . . ."

Defendant asserts that he filed "his administrative remedy on or about May 24, 2020." R. 485. Defendant has not, however, provided a copy of his request or any other evidence of his having made one, and, according to Bureau of Prisons officials, they no record of a request from defendant for a sentence reduction or for compassionate release could be found. Accordingly, defendant has not met his burden of establishing that she exhausted all administrative rights available to her, as required by the statute. *See United States v. Gold*, 2020 WL 2197839, at *2 (N.D. Ill.

May 6, 2020) (Bucklo, J.) (stating that, as the movant, defendant bears the burden to establish that he or she is eligible for a sentence reduction).

### 3. The Statutory Exhaustion Requirement is Mandatory and Cannot Be Waived by Courts.

When Congress enacted Section 603 of the First Step Act, it included an exhaustion requirement to ensure that Bureau of Prisons officials would have the first opportunity to review and consider a defendant's request for a sentence reduction or compassionate release. Congress demonstrated its intent that the Bureau of Prisons be given a minimum of 30 days to review an inmate's request before the issue is brought to court, by permitting inmates to pursue relief from the court only after the completion of the administrative appeal process or, at a minimum, 30 days after the warden's receipt of the inmate's administrative request. The requirement serves the important function of permitting the initial review of the defendant's request to be conducted by BOP officials, who are in the best position to assess the propriety and feasibility of defendant's release.

The statutory exhaustion requirement for compassionate release motions is mandatory, and cannot be waived by courts. *See United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015) (holding § 3582(c)(2)'s criteria, while not jurisdictional, are mandatory); *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) ("[w]here Congress specifically mandates, exhaustion is required"); *Ross v. Blake*, 136 S. Ct. 1850, 1855 (2016) (rejecting as "freewheeling" lower court's creation of "special circumstances" exception to statutory exhaustion requirement and permitting only the exception expressly defined by statute).

Consistent with Supreme Court precedent and this Court's rulings in other cases, since the COVID-19 outbreak, no court of appeals has found § 3582(c)(1)'s exhaustion requirement to be waivable, and the vast majority of courts have found that the requirement cannot be waived. *See United States v. Allegra*, No. 15 CR 243, Dkt. No. 232 (N.D. Ill. Apr. 13, 2020); *United States v. Beck*, No. 11 CR 640 (N.D. Ill. June 1, 2020); *United States v. Lohmeier*, No. 12 CR 1005, 2020 WL 2836817, at *4 (N.D. Ill. June 1, 2020); *United States v. Manning*, No. 15 CR 50007 (N.D. Ill. Apr. 7, 2020); *United States v. Carter*, No. 18 CR 86-JMS-DML, 2020 WL 1808288, at *1 (S.D. Ind. Apr. 9, 2020*); United States v. Fevold*, No. 19 CR 150, 2020 WL 1703846, at *1 (E.D. Wis. Apr. 8, 2020) (denying compassionate release to FCI-Elkton prisoner because he failed to exhaust administrative remedies); *United States v. Albertson*, No. 16 CR 250-TWP-MJD, 2020 WL 1815853 (S.D. Ind. Apr. 8, 2020); *United States v. Brown*, No. 17 CR 111, 2020 WL 1703859 (E.D. Wis. Apr. 8, 2020); *United States v. Moskop*, No. 11 CR 30077, 2020 WL 1862636 (S.D. Il. Apr. 14, 2020).

Even if waiver were permitted, it would be inappropriate in this case. In light of the Attorney General's directives to BOP and BOP's corresponding actions, this is not a time when defendant's pursuit of administrative remedies within BOP could be deemed futile from an *ex ante* perspective, or otherwise provide a basis for waiving § 3582(c)(1)(A)'s exhaustion requirement. Here, defendant has given the BOP no opportunity whatever to consider his request for compassionate release. Nor is this a case where exhaustion should be excused because BOP's administrative process is incapable of timely granting defendant the relief he seeks. Pursuant to the statutory

13

framework that Congress has devised, BOP must be given the opportunity to make a decision concerning defendant's request prior to any intervention by the Court.

### C. "Extraordinary and Compelling" Reasons for a Sentence Reduction

Defendant seeks release pursuant to § 3582(c)(1)(A), which allows for release where, "after considering the factors set forth in section 3553(a)…extraordinary and compelling reasons warrant such a reduction…and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Defendant has failed to satisfy this standard.

Application Note 1 to Guideline § 1B1.13 identifies factors that may constitute "extraordinary and compelling reasons" for a sentence reduction. With respect to applicable policy statements, before the passage of the First Step Act, the Sentencing Commission concluded that "extraordinary and compelling reasons" were limited to the following four scenarios:

1. The defendant suffered from a "terminal illness" or his physical or mental condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG § 1B1.13 cmt. n.1(A).

2. The defendant was at least 65 years old, experiencing a serious deterioration in physical or mental health because of the aging process, and served the lesser of 10 years or 75% of his sentence. *Id.* § 1B1.13 cmt. n.1(B).

3. The defendant's family circumstances include either the death or incapacitation of the caregiver of the defendant's minor child or minor children or the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner. *Id.* § 1B1.13 cmt. n.1(C).

14

    4. If there were "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* § 1B1.13 cmt. n.1(D).

Thus, the changes to 18 U.S.C. § 3582(C)(1)(A) made by the First Step Act altered the procedure through which compassionate release could be sought—by allowing defendants to bring their requests to court after exhausting their administrative remedies—but it did not alter the grounds for granting relief.

In his motion, defendant argues that the COVID-19 pandemic constitutes an extraordinary and compelling reason warranting his release because his 71 year-old father, who is in a mental facility, suffers from mental health disorders and defendant is his father's only relative and potential caregiver. R. 485 at 3. Defendant's desire to care for his father, who is being cared for in a mental health facility, is not an extraordinary circumstance as outlined above.

Although defendant has not specifically raised the issue of obesity, the government points out that defendant's medical records reflect that, as of December 2, 2019, defendant qualified as obese, as that term is defined in the CDC's current guidance. According to the medical records, on March 11, 2020, defendant had a body mass index (BMI) of 34.8. The CDC's most recent guidelines identify obesity (defined as having a BMI of 30 or over) as a factor increasing the risk of serious illness from COVID-19.[7] Assuming that defendant's weight has remained the same since March 2020, defendant could show, in light of the COVID-19 pandemic, that he has "a

---

7   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html

15

serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," Guidelines § 1B1.13 cmt. n.1(A)(ii)(I), in that defendant's obesity substantially diminishes his ability to provide self-care against serious injury or death as a result of COVID-19 within the environment of a correctional facility. Defendant therefore can establish an extraordinary and compelling reason for release.

### III. THE § 3553(A) FACTORS MILITATE AGAINST RELEASE.

This showing, however, does not in itself entitle defendant to relief under 18 U.S.C. § 3582(c)(1). Pursuant to the statute and the applicable policy statement, the Court must also consider whether defendant poses a danger to others and the community, and whether the requested relief would be consistent with the sentencing factors set forth in § 3553(a) factors, including defendant's history and characteristics, the risk of recidivism he poses, the time remaining to be served on his sentence, the quality of his release plan, and the impact of BOP's efforts to maintain the safety of inmates. In this case, these factors do not weigh in favor of a sentence reduction or release.

Defendant remains an economic danger to the community. Defendant's offense conduct was serious. At sentencing, the government and court found, based on a conservative estimate, the loss caused by the defendant was approximately $9,186,727. Defendant caused millions of dollars in losses to victims. Defendant preyed on unquestionably vulnerable victims. The district court found that multiple

homeowners were facing foreclosure at the time they entered into defendant's EHNS's program. And the court noted that "victim after victim took the stand and testified relating to how desperate they were and how the defendant … took advantage of these individuals with the false promise of saving their houses when he, in fact, knew that at the end their houses will not be salvaged."

At the time of his sentencing in this case, the court specifically found the need for a sentence that promoted White's respect for the law; and the court found a risk of recidivism and the need for specific, as well as general, deterrence in White's particular case. The district court found that, although this was White's first serious conviction, White had previously committed several crimes, including theft and making false statements on a credit card application. The court also highlighted White's failure to acknowledge his wrongdoing and reasoned that a significant sentence was necessary to promote White's respect for the law. In light of these factors, the sentencing court found that a sentence of 266 months' imprisonment was sufficient but not greater than necessary to achieve the statutory purposes of sentencing.

Finally, release is inconsistent with the remaining sentencing factors set forth in 18 U.S.C. § 3553(a). Under § 3553(a), this Court must consider the need for a sentence to reflect the seriousness of the offense, to provide just punishment for the offense, and to promote respect for the law. Additionally, under § 3553(a), the sentence must be consistent with the nature and circumstances of the offense and the history and characteristics of the defendant. All of these factors weigh against

release. Releasing defendant at this time would deprecate the seriousness of his offense conduct and undermine the sentence's specific and deterrent value. It is important that defendant complete his sentence in order to reflect the seriousness of the offense, promote respect for the law, provide a just punishment for the offense, afford adequate deterrence, and protect the public.

### A. Request for Home Confinement Should this Court Release Defendant.

This Court lacks the authority to order the BOP to transfer defendant to home confinement. *See* 18 U.S.C. § 3624 (directing the Director of the BOP to consider placing an inmate in home confinement). However, this Court may, in addition to reducing defendant's sentence, "impose a term of probation or supervised release, with or without conditions, that does not exceed the unserved portion of the original term of imprisonment." The conditions the Court may order include home confinement. *See* 18 U.S.C. §§ 3582(c)(1), 3563(b)(19), and 3583(d). If this Court were to find that defendant had satisfied all the statutory requirements for a sentence reduction, the government would request any reduction ordered by the court be accompanied by an order imposing a new term of probation or supervised release with a condition of strict home confinement, for the entire period of the that remains to be served.

## IV. CONCLUSION

For the reasons set forth above, defendant's motion for early release should be denied.

                                              Respectfully submitted,

                                              JOHN R. LAUSCH, JR.
                                              United States Attorney

By:   */s/ Tiffany A. Ardam*
       TIFFANY A. ARDAM
       Assistant U.S. Attorney
       219 South Dearborn St., 5th Floor
       Chicago, Illinois 60604
Dated: August 24, 2020         (312) 353-0951

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 06 CR 763 |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CHARLES WHITE | ) | |

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

was served pursuant to the district court's ECF system. as to ECF filers, if any, and was sent by first-class mail on August 24, 2020 to the following non-ECF filer:

Charles White
Reg. No. 40355-424
FCI Milan
P.O. BOX 1000
MILAN, MI 48160

                Respectfully submitted,

                JOHN R. LAUSCH, Jr.
                United States Attorney

          By:  */s/ Tiffany A. Ardam*
                TIFFANY A. ARDAM
                Assistant United States Attorney
                219 South Dearborn Street
                Chicago, Illinois 60604
                (312) 353-0951

Dated:  August 24, 2020